# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 11, 2006          Decided July 11, 2006

No. 05-5269

ELOUISE PEPION COBELL, ET AL.,
APPELLEES

v.

DIRK KEMPTHORNE, SECRETARY OF THE INTERIOR, ET AL.,
APPELLANTS

———

Appeals from the United States District Court
for the District of Columbia
(No. 96cv01285)

———

*Mark B. Stern*, Attorney, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Peter D. Keisler*, Assistant Attorney General*, Kenneth L. Wainstein*, U.S. Attorney, *Gregory G. Katsas*, Deputy Assistant Attorney General, and *Robert E. Kopp*, *Thomas M. Bondy*, *Alisa B. Klein*, *Mark R. Freeman*, *I. Glenn Cohen* and *Isaac J. Lidsky*, Attorneys.

*Keith M. Harper* argued the cause for appellees. With him on the brief were *Dennis M. Gingold*, *Elliott H. Levitas*, *G. William Austin, III*, and *Mark I. Levy*.

Before:  TATEL and BROWN, *Circuit Judges,* and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:  For the ninth time in six years we consider an appeal in this longstanding dispute between beneficiaries of Indian land trusts and their trustee, the United States.  In this most recent iteration, the government challenges a district court order requiring that every mailing to trust beneficiaries include a notice stating that "any" information provided about trust matters "may be unreliable."  The government also asks us to assign the case to a different district judge.  Because we agree with the government that the order exceeded the district court's authority, we vacate and remand for further proceedings.  And for the reasons given in this opinion, we instruct the chief judge of the district court to reassign the case.

## I.

In the latter part of the nineteenth century, the United States took title to Indian lands as trustee for individual Indians, thereby assuming a fiduciary obligation to hundreds of thousands of Indians.  We described the history of the government's trust obligations, now delegated to the Secretaries of Interior and Treasury, in *Cobell v. Norton*, 240 F.3d 1081, 1086-92 (D.C. Cir. 2001) ("*Cobell VI*").

Ten years ago, five Indians—we shall refer to them as "plaintiff-beneficiaries"—filed a complaint in the U.S. District Court for the District of Columbia on behalf of themselves and all other trust beneficiaries alleging the federal government had breached its fiduciary obligations. Plaintiff-beneficiaries claimed, among other things, that the government destroyed critical records, failed to account to trust beneficiaries, and

either lost trust assets or converted them to government use. Plaintiff-beneficiaries requested declaratory and injunctive relief against Interior and Treasury officials "to force the government to abide by its duty to render an accurate accounting" of the assets held in Individual Indian Money (IIM) trust accounts. *Cobell v. Babbitt*, 91 F. Supp. 2d 1, 6-7 (D.D.C. 1999) ("*Cobell V*"). After certifying the case as a class action and conducting "a lengthy trial, the district court concluded that the federal government and its officers have been derelict in their duties." *Cobell VI*, 240 F.3d at 1086. Accordingly, the court "ordered them to come into compliance with their duties," and remanded the case to Interior and Treasury. *Id.* at 1094. The district court nonetheless "retained continuing jurisdiction over the case for the next five years" and required "quarterly status reports summarizing the government's progress." *Id.*

In *Cobell VI*, although we "generally affirm[ed]," we "order[ed] the district court to modify the characterization of some of its findings." *Id.* at 1086. We recognized that "[t]he trusts at issue here were created over one hundred years ago through an act of Congress, and have been mismanaged nearly as long." *Id.* Although "[t]he level of oversight proposed by the district court may well be in excess of that countenanced in the typical delay case," we observed, "so too is the magnitude of government malfeasance and potential prejudice to the plaintiffs' class." *Id.* at 1109. We approved the district court's plan "to wait until a proper accounting can be performed" and then to "assess [the government's] compliance with [its] fiduciary obligations." *Id.* at 1110. Still, we made clear that we "expect[ed] the district court to be mindful of the limits of its jurisdiction" and therefore to refrain from unduly interfering with Interior's "conduct in preparing an accounting." *Id.*

Since *Cobell VI*, we have resolved six more appeals, plus two more today. These appeals address not only the core issue

of how the accounting should be conducted, but also various collateral matters ranging from contempt citations against senior Interior officials to orders requiring the Department to disconnect its computer systems from the internet. *See Cobell v. Kempthorne*, No. 05-5388, ___ F.3d ___ (D.C. Cir. July 11, 2006) (computer disconnection); *In re Kempthorne*, No. 03-5288, ___ F.3d ___, 2006 WL 1563612 (D.C. Cir. June 9, 2006) (recusal of Special Master); *Cobell v. Norton*, 428 F.3d 1070 (D.C. Cir. 2005) ("*Cobell XVII*") (accounting); *Cobell v. Norton*, 392 F.3d 461 (D.C. Cir. 2004) ("*Cobell XIII*") (accounting); *Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ("*Cobell XII*") (computer disconnection); *In re Brooks*, 383 F.3d 1036 (D.C. Cir. 2004) (recusal of Special Master); *Cobell v. Norton*, 334 F.3d 1128 (D.C. Cir. 2003) ("*Cobell VIII*") (contempt citations).

This appeal involves yet another collateral issue, which arose when plaintiff-beneficiaries sought to require Interior to include in every written communication with Indian trust beneficiaries a notice stating that "[t]he Trustee-Delegates have admitted that they do not know whether the information that they are providing to you about your Trust assets is accurate and complete" and that "the government is currently unable to provide all individual Indian trust beneficiaries an accurate and complete accounting of their trust assets and is unable to provide a timetable for when that accounting will be rendered." *Cobell v. Norton*, 229 F.R.D. 5, 19-20 (D.D.C. 2005) ("*Cobell XV*") (quoting Pls.' Proposed Order). According to plaintiff-beneficiaries, the district court had authority to issue such an order either under Federal Rule of Civil Procedure 23(d) or pursuant to the court's inherent equitable powers. The government opposed the motion. On July 12, 2005, the district court, without holding a hearing, granted the motion but altered the proposed text. In its order—we shall refer to it as the "July 12 order"—the district court required Interior to include the

following notice in all written communications to trust beneficiaries:

> Evidence introduced in the *Cobell* case shows that *any* information related to the IIM Trust, IIM Trust lands, or other IIM Trust assets that current and former IIM Trust account holders receive from the Department of the Interior may be *unreliable*. Current and former IIM Trust account holders should keep in mind the questionable reliability of IIM Trust information received from the Department of the Interior if and when they use such information to make decisions affecting their IIM Trust assets.

*Id.* at 21-22. Reasoning that even communications that on their face bear no relation to trust accounts "might influence an Indian beneficiary's trust-related decisions," the district court directed Interior to include the notice in all written communications with beneficiaries "without regard to subject matter." *Id.* at 17. In granting the motion, the district court relied on Rule 23, emphasizing that the order "flow[ed] from the fact that this case is a class action rather than from the Court's equitable powers." *See id.* at 15 n.7.

The government now appeals, asking that we vacate the July 12 order as unauthorized by Rule 23. On the government's motion, we stayed the July 12 order pending appeal. *Cobell v. Norton*, No. 05-5269 (D.C. Cir. Sept. 2, 2005). Also, relying on language in the July 12 opinion and a series of district court rulings reversed by this court, the government moved to have the case assigned to a different judge. We consolidated that motion with this appeal. *Cobell v. Norton*, No. 05-5068 (D.C. Cir. Sept. 15, 2005).

**II.**

We begin with the July 12 Rule 23(d) order. Before addressing the government's challenge, however, we must consider plaintiff-beneficiaries' argument that we lack jurisdiction because, according to them, the order is not immediately appealable. The government contends that we do have jurisdiction to review the July 12 order either because it is an appealable injunction or pursuant to the collateral order doctrine. *See* 28 U.S.C. § 1292(a)(1) (making injunctions immediately appealable); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) (laying out collateral order doctrine). Alternatively, the government urges us to treat its appeal as a petition for a writ of mandamus. Because we agree that the order qualifies as an injunction, we need not address the government's other two arguments.

Under 28 U.S.C. § 1292(a)(1), circuit courts have jurisdiction to review "[i]nterlocutory orders . . . granting, continuing, modifying, refusing or dissolving injunctions." Regardless of how the district court may choose to characterize its order, section 1292(a)(1) applies to any order that has "the practical effect of granting or denying an injunction," so long as it also "might have a serious, perhaps irreparable, consequence, and . . . can be effectually challenged only by immediate appeal." *I.A.M. Nat'l Pension Fund Benefit Plan A v. Cooper Indus., Inc.*, 789 F.2d 21, 23-24 (D.C. Cir. 1986) (internal quotation marks omitted). As both parties agree, to have "the practical effect of granting or denying an injunction" an order must be "directed to a party" and "enforceable by contempt." *Id.* at 24 (internal quotation marks omitted). Quoting from Wright and Miller, plaintiff-beneficiaries argue that to qualify as an injunction an order must meet a third requirement: it "must provide 'some or all of the substantive relief sought by a complaint in more than temporary fashion.'" Appellees' Br. 9 (quoting 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3922 (2d ed. 1996))

(Wright's internal quotation marks and footnote omitted). But plaintiff-beneficiaries omit two key words—words that, as we shall see, control this case. The treatise, like our precedent, actually says that the definition of "injunction" includes orders "designed to accord *or protect* some or all of the substantive relief sought by a complaint in more than temporary fashion." 16 Wright, Miller & Cooper, *supra*, § 3922 (emphasis added) (internal quotation marks and footnote omitted); *I.A.M. Nat'l Pension Fund*, 789 F.2d at 24 (same language).

As noted above, it makes no difference that the district court said the July 12 order "flow[ed] from the fact that this case is a class action rather than from the Court's equitable powers," *Cobell XV*, 229 F.R.D. at 15 n.7. *See Lightfoot v. District of Columbia*, No. 05-7028, ___ F.3d ___, 2006 WL 1389559, at *3 (D.C. Cir. May 23, 2006) (per curiam) ("Although appellees reiterate the district court's contention that it did not grant an injunction, we rather easily conclude that the district court's . . . order was just that."). The only question is whether the order has "the practical effect of granting or denying an injunction." *Supra* p. 6. Put another way, if the July 12 order looks like an injunction and acts like an injunction, it's an injunction—at least for jurisdictional purposes.

To qualify as an injunction, then, an order must (1) be "directed to a party"; (2) be "enforceable by contempt"; (3) be "designed to accord or protect" substantive relief; and (4) threaten "a serious, perhaps irreparable, consequence" and be challengeable "only by immediate appeal." *I.A.M. Nat'l Pension Fund*, 789 F.2d at 24 (internal quotation marks omitted). The parties agree that the July 12 order satisfies the first two requirements: it is directed to a party—the Interior Secretary—and is enforceable by contempt. The parties have very different views as to whether the order satisfies the third requirement: that it accord or protect substantive relief.

Plaintiff-beneficiaries see the order as merely procedural, characterizing it as a "class-action case-management order designed to provide a fair proceeding that preserves the opportunity for effective judicial relief in the future." Appellees' Br. 10. According to the government, "[t]he order does not govern the conduct of the litigation; it is a substantive order that aims to affect the primary conduct of the class." Appellants' Br. 46.

We agree with the government. Unlike a case-management order, which would merely advance the litigation procedurally, the July 12 order seeks to protect substantive rights during the pendency of the litigation. The district court expressly meant for the order to help class members make intelligent decisions about trust assets, not to facilitate their participation in the litigation: "The court-ordered accounting is designed to promote class members' rights to make fully informed choices about their trust assets. If there are no more informed decisions to be made, or if all the trust assets are gone, then the court-ordered accounting will be useless to the Indians." *Cobell XV*, 229 F.R.D. at 16. Plaintiff-beneficiaries themselves describe the July 12 order as "serv[ing] to protect *pendente lite* Plaintiff-Beneficiaries' interest in the trust accounts that are the subject of the litigation and thus to ensure that the ultimate relief is not nugatory or ineffective as to at least some of the members of the class." Appellees' Br. 10 n.10. Protecting beneficiary rights represents classic injunctive relief. *See Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.*, 412 F.2d 165, 168 (D.C. Cir. 1969) ("The usual role of a preliminary injunction is to preserve the status quo pending the outcome of litigation.").

We also agree with the government that the July 12 order satisfies the final requirement, as it threatens "a serious, perhaps irreparable, consequence" and "can be effectually challenged

only by immediate appeal." *I.A.M. Nat'l Pension Fund*, 789 F.2d at 24 (internal quotation marks omitted). The order requires a cabinet agency to confess its own unreliability not just in mailings relating to trust accounts, but in every mailing on any subject. *See Cobell XV*, 229 F.R.D. at 17 (requiring notice in all mailings "without regard to subject matter"). This strikes us as both serious and, if unjustified, not correctable at the end of the litigation.

Having confirmed our jurisdiction, we next consider plaintiff-beneficiaries' argument that the government has forfeited its challenge to the district court's authority to issue the July 12 order by failing to raise the argument in the district court. *See Flynn v. Comm'r*, 269 F.3d 1064, 1068-69 (D.C. Cir. 2001) ("Generally, an argument not made in the lower tribunal is deemed forfeited and will not be entertained absent exceptional circumstances." (internal quotation marks omitted)). According to plaintiff-beneficiaries, "the district court determined" that "'Interior has previously conceded and does not now dispute' the court's authority to enter the July 12 order pursuant to Rule 23(d)." Appellees' Br. 15 (quoting *Cobell XV*, 229 F.R.D. at 13). The district court determined no such thing. The court actually said: "Interior has previously conceded and does not now dispute this Court's authority to restrict Interior's communications with Indian beneficiaries pursuant to Rule 23(d)." *Cobell XV*, 229 F.R.D. at 13. The difference is critical. Although, as the district court pointed out, the government never challenged the court's authority to issue communications-related orders *in general*, the government nowhere conceded that the district court had authority to enter *the July 12 order*. Far from it. The government expressly objected to the contents of the order: "any notice," the government argued, "should only inform class members of the existence of this litigation, of their potential class membership, and of their right to consult with class counsel." Defs.' Opp'n to Pls.' Mot. 7 (internal quotation

marks omitted). Because the government has preserved its challenge to the July 12 order, we turn to the merits.

## III.

Although the July 12 order has the effect of an injunction, the district court relied on authority drawn from Rule 23(d), not on its equitable authority. *See supra* p. 5. In particular, the court cited Rule 23(d)(3), which authorizes district courts to issue orders "imposing conditions on the representative parties or on intervenors." Fed. R. Civ. P. 23(d)(3); *see Cobell XV*, 229 F.R.D. at 13 (relying on this language). But nothing in Rule 23(d)(3) supports the July 12 order. That order imposed a condition not on a representative party or an intervenor, but on the defendant. Hardly a technicality, the limitation to representative parties and intervenors stems from Rule 23(d)(3)'s purpose: ensuring proper representation of class interests. *See* Fed. R. Civ. P. 23 advisory committee's note (1966 amendment) ("Subdivision (d)(3) reflects the possibility of conditioning the maintenance of a class action, e.g., on the strengthening of the representation, and recognizes that the imposition of conditions on intervenors may be required for the proper and efficient conduct of the action." (citation omitted)). The July 12 order had an entirely different purpose—to help protect trust beneficiaries from making poor decisions based on faulty information unrelated to the litigation itself.

Instead of defending the district court's flawed reliance on Rule 23(d)(3), plaintiff-beneficiaries argue that the district court had authority to issue the July 12 order under Rule 23(d)(2), which, although the district court nowhere cited it, authorizes orders

> requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may

> direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action.

Fed. R. Civ. P. 23(d)(2). According to plaintiff-beneficiaries, the July 12 order fits within the rule's authorization of notice "*for the protection of the members of the class* or otherwise for the fair conduct of the action." Appellees' Br. 17 (quoting Fed. R. Civ. P. 23(d)(2)) (appellees' emphasis). Not until later in their brief, however, do plaintiff-beneficiaries quote Rule 23(d)(2)'s second half, which makes clear that the rule contemplates not substantive relief of the kind the court granted here, *see supra* p. 8, but only notice of procedural matters—such as "any step in the action, . . . the proposed extent of the judgment," and "the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action," Fed. R. Civ. P. 23(d)(2). Rule 23's advisory committee notes, though describing the rule's list of permissible subjects for notice as "non-exhaustive," nowhere suggest that the rule authorizes substantive, as opposed to procedural, notice. Fed. R. Civ. P. 23 advisory committee's note (1966 amendment); *see also* Fed. R. Civ. P. 23(d)(5) (authorizing orders "dealing with similar procedural matters").

None of the four cases plaintiff-beneficiaries cite supports the proposition that Rule 23(d)(2) authorizes substantive relief. Indeed, each case, even including one in which a Rule 23(d) order was reversed, concerns communications relating to the litigation's procedural posture, not its underlying merits. In *In re School Asbestos Litigation*, 842 F.2d 671, 676 (3d Cir. 1988), upon which plaintiff-beneficiaries rely most heavily, the Third

Circuit affirmed a notice that "identifie[d] the member companies of the SBA, note[d] that those member companies 'principally fund' the SBA, state[d] that those companies [were] defendants in the underlying class action and that all public and private, elementary and secondary schools [were] plaintiffs in the litigation," and provided "the names, addresses and telephone numbers of lead counsel for the plaintiff class"—all procedural information. So too in *Great Rivers Cooperative of Southeastern Iowa v. Farmland Industries, Inc.*, 59 F.3d 764, 765 (8th Cir. 1995), where the Eighth Circuit reversed an order requiring defendants to print in a newsletter a rebuttal to an article that "as a whole appear[ed] to constitute an implied solicitation to potential class members to opt out of this litigation if and when a class is certified and notice given" and "to refrain from communicating anything in the future that could reasonably be taken as an invitation to opt out." Likewise, in *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1236 (9th Cir. 1999), the Ninth Circuit affirmed an order requiring "the government to provide notice of the pending action and the injunction" the district court had issued, and in *In re Synthroid Marketing Litigation*, 197 F.R.D. 607, 610 (N.D. Ill. 2000), the district court ordered notice "sent to the class members . . . providing them with correct information about what they need to do if they wish to either participate in, object to or opt out of the proposed settlement." Four cases, four procedural notices.

As these cases demonstrate, Rule 23(d)(2) authorizes notice to protect class members' right to participate in the litigation; it does not authorize substantive orders protecting the very rights class members seek to vindicate. To keep class members informed of this litigation, the district court here could have simply ordered notice of the pendency of the litigation, the rulings it had already issued, and beneficiaries' right to contact class counsel—exactly the type of order the government recommended, *see* Defs.' Opp'n to Pls.' Mot. 7; *supra* p. 9.

But the district court went much further. Rather than merely informing class members of the litigation's progress or of facts already established, the district court required Interior to attest to facts it disputed. To make matters worse, the notice's broad indictment of Interior's reliability, accentuated by the emphasis on the word "any," extends well beyond trust account information: "*any* information related to the IIM Trust, IIM Trust lands, or other IIM Trust assets that current and former IIM Trust account holders receive from the Department of the Interior may be *unreliable*." *Cobell XV*, 229 F.R.D. at 21-22. To be sure, we have no doubt Interior's trust account information has serious reliability problems. *See, e.g.*, *Cobell VI*, 240 F.3d at 1089 ("Not only does the Interior Department not know the proper number of accounts, it does not know the proper balances for each IIM account, nor does Interior have sufficient records to determine the value of IIM accounts."). But nothing in the record reveals any problems with other information such as land appraisals. The district court thought that Interior's "more complicated calculations, such as land appraisals" could not "be trusted" given deficiencies in the trust accounts, *Cobell XV*, 229 F.R.D. at 16, but it pointed to nothing in the record indicating that trust account problems might infect Interior's calculations in other areas.

Exacerbating the notice's overbreadth is its wide distribution. Noting that trust information could affect all decisions by trust beneficiaries, the district court ordered Interior to send the notice with every written communication. *Id.* at 17 n.10. The notice's inclusion in mailings unrelated to trust accounts (such as those regarding health care or education), especially given the notice's sweeping language, suggests that any Interior mailing "may be *unreliable*"—a conclusion both unsupported by the record and likely quite harmful to the Department and its programs. Because the July 12 order seeks

to protect substantive rights and inflicts substantive harm on Interior, it falls outside Rule 23(d)(2)'s scope.

## IV.

This brings us to the government's motion to assign the case to a different judge. In support, the government cites two types of evidence: language from the opinion accompanying the July 12 order and "[r]epeated reversals" of district court rulings. Appellants' Br. 55.

### *The July 12 Opinion*

Because the government relies so heavily on the district court's language, and because it is important to read that language in context, we quote at length. The opinion's "Background" section begins:

> At times, it seems that the parties, particularly Interior, lose sight of what this case is really about. The case is nearly a decade old, the docket sheet contains over 3000 entries, and the issues are such that the parties are engaged in perpetual, heated litigation on several fronts simultaneously. But when one strips away the convoluted statutes, the technical legal complexities, the elaborate collateral proceedings, and the layers upon layers of interrelated orders and opinions from this Court and the Court of Appeals, what remains is the raw, shocking, humiliating truth at the bottom: After all these years, our government still treats Native American Indians as if they were somehow less than deserving of the respect that should be afforded to everyone in a society where all people are supposed to be equal.

For those harboring hope that the stories of murder, dispossession, forced marches, assimilationist policy programs, and other incidents of cultural genocide against the Indians are merely the echoes of a horrible, bigoted government-past that has been sanitized by the good deeds of more recent history, this case serves as an appalling reminder of the evils that result when large numbers of the politically powerless are placed at the mercy of institutions engendered and controlled by a politically powerful few. It reminds us that even today our great democratic enterprise remains unfinished. And it reminds us, finally, that the terrible power of government, and the frailty of the restraints on the exercise of that power, are never fully revealed until government turns against the people.

The Indians who brought this case are beneficiaries of a land trust created and maintained by the government. The Departments of the Interior and Treasury, as the government's Trustee-Delegates, were entrusted more than a century ago with both stewardship of the lands placed in trust and management and distribution of the revenue generated from those lands for the benefit of the Indians. Of course, it is unlikely that those who concocted the idea of this trust had the Indians' best interests at heart—after all, the original General Allotment Act that created the trust was passed in 1887, at a time when the government was engaged in an "effort to eradicate Indian culture" that was fueled, in part, "by a greed for the land holdings of the tribes[.]" *Cobell v. Babbitt* ("*Cobell V*"), 91 F. Supp. 2d 1, 7-8 (D.D.C. 1999). But regardless of the motivations of the originators of the trust, one would expect, or at least hope, that the modern Interior department and its

modern administrators would manage it in a way that reflects our modern understandings of how the government should treat people. Alas, our "modern" Interior department has time and again demonstrated that it is a dinosaur—the morally and culturally oblivious hand-me-down of a disgracefully racist and imperialist government that should have been buried a century ago, the last pathetic outpost of the indifference and anglocentrism we thought we had left behind.

*Cobell XV*, 229 F.R.D. at 7 (alteration in original). The district court next outlined the "Factual History," first asserting that "Interior's management of the Indian trust has been a nightmare from the beginning," *id.*, and then briefly chronicling Interior's trust management failings, which have been well-documented both in this litigation and elsewhere, *id.* at 8; *Misplaced Trust: The Bureau of Indian Affairs' Mismanagement of the Indian Trust Fund*, H.R. Rep. No. 102-449 (1992). Finding that "[t]he ignominious record speaks for itself," *Cobell XV*, 229 F.R.D. at 8, the court recited many of its previous findings of mismanagement. "The problems that result from Interior's inability to maintain complete and accurate records of the IIM trust," the court continued, "are compounded and made more intractable by the penchant of Interior's employees, officials, and litigation counsel to be less than forthcoming with the Court." *Id.* at 9. In support of this statement, the court noted that it had on several occasions cited officials for contempt or referred government attorneys to the Committee on Grievances. *Id.*

"Add vindictiveness to dishonesty and managerial ineptitude," the court went on, giving as the primary example of "vindictiveness" Interior's alleged violation of the court's order forbidding retaliation against Interior officials who cooperated

with plaintiff-beneficiaries. *Id.* at 9-10. According to the district court, Interior violated that order by taking "severe adverse employment actions" against an Interior official, Mona Infield, who had provided an affidavit to assist plaintiff-beneficiaries. *See id.* at 10. Although "the matter was later settled to the Court's satisfaction," the court found it "illustrative enough of the depths to which Interior has sunk that the Court found it necessary to issue a general anti-retaliation order in the first place; but Interior's subsequent willful retaliation against its own employee in the face of such an order betrays a truly Machiavellian guile." *Id.*

"As if the Infield business was not enough," the court continued, "Interior's wrath was turned on the Indian beneficiaries themselves in the wake of the Court's September 29, 2004 order restricting communications between Interior and class members concerning sales of Indian trust land (the 'land-sales order')." *Id.* "'[B]etween October 1, 2004 and October 8, 2004,'" the court explained, "'a number of individual Indian trust beneficiaries were denied either their trust checks or information regarding their trust checks by BIA employees who cited this Court's [land-sales] Order as justification,'" even though "the Court had previously made clear at a hearing held on October 1, 2004, that the land-sales order had no effect whatsoever on Interior's ability to distribute trust checks." *Id.* (quoting *Cobell v. Norton*, 355 F. Supp. 2d 531, 542 (D.D.C. 2005)) (alteration in original). "Apparently," according to the court, "Interior's withholding of trust checks or information about trust checks from the Indians was one outward manifestation of a period of Byzantine maneuvering within the department in an attempt to either evade or, failing that, mischaracterize and vilify this Court and the land-sales order." *Id.* at 11. "In light of the record in this case," the court found it "more likely that the Secretary's actions constituted willful

misconduct" than that she was "grossly negligent." *Id.* (internal quotation marks omitted).

The court's "Factual History" concludes:

> But these are only examples. The entire record in this case tells the dreary story of Interior's degenerate tenure as Trustee-Delegate for the Indian trust—a story shot through with bureaucratic blunders, flubs, goofs and foul-ups, and peppered with scandals, deception, dirty tricks and outright villainy—the end of which is nowhere in sight. Despite the breadth and clarity of this record, Interior continues to litigate and relitigate, in excruciating fashion, every minor, technical legal issue. This is yet another factor forestalling the final resolution of the issues in this case and delaying the relief the Indians so desperately need. It is against this background of mismanagement, falsification, spite, and obstinate litigiousness that this Court is to evaluate the general reliability of the information Interior distributes to IIM account holders.

*Id.* (citation omitted).

After recounting the "Procedural History," the court began its "Discussion," *see id.* at 11-12, dropping the following footnote:

> Interior's tongue-in-cheek summary of its responses to the plaintiffs' motion—"The Proposed Notice is the wrong notice at the wrong time to the wrong group of recipients paid for, and sent out by, the wrong party[,]" Defs.' Opp. at 2—typifies the level of respect that Interior generally accords both the Indian beneficiaries and this Court. The puerile reference is not lost on the

Court, but Interior's misguided attempt at levity in the context of litigating an issue of immense importance to 500,000 members of a historically oppressed people is disgraceful. Unfortunately, it is also unsurprising from a defendant that this Court has charged with "setting the gold standard for arrogance in litigation strategy and tactics." [*Cobell v. Norton*, 357 F. Supp. 2d 298, 307 (D.D.C. 2005).] This Court has played host to countless pleadings from clinically insane litigants and prison inmates but has rarely seen such a disrespectful tenor in a court filing.

*Id.* at 13 n.5 (first alteration in original).

Turning to the merits, the district court stated:

Interior does not dispute the factual predicates of the plaintiffs' argument. Interior concedes that all trust-related information Interior communicates to Indian beneficiaries is inherently unreliable. Of course, anything other than a concession of this point would be laughable in light of the record in this case. The factual record, composed of the accumulated detritus of nine years spent examining Interior's odious performance as Trustee-Delegate for the Indian trust, is certainly clear enough and smattered with a sufficient number of specific abuses to satisfy the . . . standard for relief under Rule 23(d). If Interior cannot even ascertain the number of existing IIM account holders, how can any of its more complicated calculations, such as land appraisals, be trusted? If Interior is willing to deceive this Court, why would anyone think that Interior would hesitate to lie to the Indians?

*Id.* at 16. After resolving several matters not at issue here, the court concluded:

> While it is undeniable that Interior has failed as a Trustee-Delegate, it is nevertheless difficult to conjure plausible hypotheses to explain Interior's default. Perhaps Interior's past and present leaders have been evil people, deriving their pleasure from inflicting harm on society's most vulnerable. Interior may be consistently populated with apathetic people who just cannot muster the necessary energy or emotion to avoid complicity in the Department's grossly negligent administration of the Indian trust. Or maybe Interior's officials are cowardly people who dodge their responsibilities out of a childish fear of the magnitude of effort involved in reforming a degenerate system. Perhaps Interior as an institution is so badly broken that even the most well-intentioned initiatives are polluted and warped by the processes of implementation.[15] The government as a whole may be

---

[15] This hypothesis may be the most plausible, as there is some evidence to substantiate it. In June, 2002, Interior filed with the Court a report generated by Interior's Office of Inspector General ("OIG") following an investigation of "seven specific issues relating to allegations that senior managers and attorneys of the Department of the Interior . . . engaged in misconduct." *See* Notice [1355] of Filing the Office of Inspector General's Report: Allegations Concerning Conduct of Department of the Interior Employees Involved in Various Aspects of the Cobell Litigation ("OIG Rep."), June 25, 2002, exec. summ. at 1. This investigation was conducted during the pendency of the 2002 contempt trial mentioned above. In the course of investigating Interior, the

inherently incapable of serving as an adequate fiduciary because of some structural flaw.  Perhaps the Indians were doomed the moment the first European set foot on American soil.  Who can say?  It may be that the opacity of the cause renders the Indian trust problem insoluble.

On numerous occasions over the last nine years, the Court has wanted to simply wash its hands of Interior and its iniquities once and for all.  The plaintiffs have invited the Court to declare that Interior has repudiated the Indian trust, appoint a receiver to liquidate the trust assets, and finally relieve the Indians of the heavy yoke of government stewardship.  The

---

OIG "uncovered bad judgment, unfocused management, a myriad of definitional issues, and extreme hostility among the players and entities[,]" and "found factions with extremely myopic views of and approaches to the very complex issues at hand." OIG Rep., exec. summ. at 2. The OIG noted that in its decades of oversight of Interior, "we have often observed . . . a Department whose components are blinded by clouded judgment and crippled by distrust[,]" *id.* at 6, characterized by a "bunker mentality" in which Interior employees generally "begin by protecting [their] own Bureau or office, to the detriment of other Bureaus or offices if necessary; then protect the Department, and/or the institution or position it has advanced; [and] finally, protect the public interests . . . ." *Id.*  The OIG found that while Interior's various entities and employees are "fueled by a multitude of motivations, many of which were well-intentioned[,]" *id.* at 2, one of the least prevalent motivations "was to protect and advance the interests of Individual Indian Trust account holders." *Id.*

Court may eventually do all these things—but not yet. Giving up on rehabilitating Interior would signal more than the downfall of a single administrative agency. It would constitute an announcement that negligence and incompetence in government are beyond judicial remedy, that bureaucratic recalcitrance has outpaced and rendered obsolete our vaunted system of checks and balances, and that people are simply at the mercy of governmental whim with no chance for salvation. The Court clings to a slim and quickly receding hope that future progress may vitiate the need for such a grim declaration.

This hope is sustained in part by the fact that the Indians who brought this case found it in themselves to stand up, draw a line in the sand, and tell the government: Enough is enough—this far and no further. Perhaps they regret having done so now, nine years later, beset on all sides by the costs of protracted litigation and the possibility that their efforts may ultimately prove futile; but still they continue. The notice requirement established by the Court today represents a significant victory for the plaintiffs. For the first time in the history of this case, the majority of Indian beneficiaries will be aware of the lawsuit, the plaintiffs' efforts, and the danger involved in placing any further confidence in the Department of the Interior. Perhaps more importantly, the Indians will be advised that they may contact class counsel for guidance on their trust-related concerns. This likely will bring to light a wealth of new evidence concerning Interior's mismanagement of the trust; it will also open an avenue to relief for individuals throughout Indian country whose suffering might otherwise be buried forever in a bureaucratic tomb.

Real justice for these Indians may still lie in the distant future; it may never come at all. This reality makes a statement about our society and our form of government that we should be unwilling to let stand. But perhaps the best that can be hoped for is that people never forget what the plaintiffs have done here, and that other marginalized people will learn about this case and follow the Indians' example.

*Id.* at 22-23 & n.15 (omissions and alterations in original).

*Reversals*

Since *Cobell VI*, this court has heard eight appeals in this case, each time setting aside a district court order or other action against Interior. According to the government, this pattern provides further evidence of the need to assign the case to a different judge.

In the first of these eight opinions, *Cobell VIII*, we reversed contempt citations against the Secretary and Assistant Secretary of Interior, finding the district court's reasoning on one point "mystifying." *Cobell VIII*, 334 F.3d at 1149. We also issued a writ of mandamus directing the removal of a "Special Master-Monitor" whom the district court had appointed over the government's objection. *Id.* at 1135-36, 1142. Among other things, we found the district court had given the Monitor "an investigative, quasi-inquisitorial, quasi-prosecutorial role that is unknown to our adversarial legal system." *Id.* at 1142.

In the second opinion, *In re Brooks*, we issued another writ of mandamus, this time directing the district court to disregard reports from a Special Master who "had been performing investigative and adjudicative tasks that entailed *ex parte* communications with witnesses and third parties." *In re Brooks*, 383 F.3d at 1044. We found "the nature and extent of [the

Special Master's] *ex parte* contacts would lead an informed observer reasonably to question his impartiality." *Id.* at 1046. The district court's action, we explained, was as if "a judge presiding over a criminal proceeding" had "dispatch[ed] his law clerk to visit the scene of the crime, take fingerprints, interview witnesses, and report back to the judge about his findings." *Id.*

In *Cobell XII*, we vacated an order requiring "disconnection of substantially all of the Department of the Interior's computer systems from the Internet." *Cobell XII*, 391 F.3d at 253. We found the district court had impermissibly "shift[ed] the burden of persuasion to the Secretary to show why disconnecting most of Interior's IT systems was unnecessary," *id.* at 259, and "abused its discretion by not holding an evidentiary hearing before issuing the . . . injunction," *id.* at 262.

In *Cobell XIII*, we largely vacated a "historical accounting" injunction requiring Interior to create a plan for fulfilling its fiduciary obligations and "identify any portions of the plan that might be deemed inconsistent with the common law trust duties previously identified by the district court, and explain why the identified portion or portions should not be considered inconsistent with these duties." *Cobell XIII*, 392 F.3d at 469. We explained that "the court's innovation of requiring defendants to file a plan and then to say what 'might' be wrong with it turns the litigation process on its head," *id.* at 474, and that "the court may not micromanage court-ordered reform efforts undertaken to comply with general trust duties enumerated by the court, and then subject defendants to findings of contempt for failure to implement such reforms," *id.* at 478.

In *Cobell XVII*, we set aside another historical accounting injunction, noting that "[e]ven the plaintiffs agree[d] that the injunction should not stand because they believe[d] it to be impossible to perform." *Cobell XVII*, 428 F.3d at 1072. The

district court had "completely disregarded relevant information about the costs of its injunction," *id.* at 1077, and, in rejecting the government's plan to use statistical sampling, "acknowledged the extra burden in time and money but saw that singular burden as outweighed simply by the beneficiaries' preferences." *Id.* at 1078.

In *In re Kempthorne*, we issued yet another writ of mandamus, this time ordering the district court to strike several Special Master reports from the record. Charged with investigating a contractor's allegation that, among other things, Interior had withheld critical information from the court, the Special Master hired an employee of that very contractor—indeed, an employee who would "likely be a witness in [the contractor's] case against the Department." *In re Kempthorne*, 2006 WL 1563612, at *5. We thought it "difficult to imagine a more biased way of conducting and reporting upon an investigation." *Id.*

Today, we set aside two more orders against Interior. In No. 05-5388, we again vacate an order requiring disconnection of virtually all Interior computers from the internet, finding that "the district court glossed over the immensity of the disruption that would occur to Interior's operations." *Cobell v. Kempthorne*, No. 05-5388, slip op. at 28. And in this appeal, we set aside an order requiring Interior to confess its own unreliability in every mailing to trust beneficiaries on any subject. As we explained above, the district court again undervalued the potential harm to Interior, and then exacerbated that harm by requiring notice more sweeping than the record can support. *See supra* p. 13.

## V.

We have authority to assign a case to a different district judge under "our general supervisory power to 'require such

further proceedings to be had as may be just under the circumstances.'" *United States v. Microsoft Corp.*, 56 F.3d 1448, 1463 (D.C. Cir. 1995) (per curiam) (*Microsoft I*) (quoting 28 U.S.C. § 2106). Because unfavorable rulings are "[a]lmost invariably . . . proper grounds for appeal, not for recusal," we exercise this authority only in extraordinary cases. *Liteky v. United States*, 510 U.S. 540, 555 (1994).

Reassignment requests usually arise from accusations that a judge engaged in improper outside communications. *See, e.g.*, *Microsoft I*, 56 F.3d at 1463-65 (instructing district court to reassign case where judge relied on a book that was not in evidence); *United States v. Microsoft Corp.*, 253 F.3d 34, 46 (D.C. Cir. 2001) (en banc; per curiam) (ordering reassignment where trial judge "engaged in impermissible *ex parte* contacts by holding secret interviews with members of the media and made numerous offensive comments about Microsoft officials in public statements outside of the courtroom"). Indeed, earlier in this litigation, the government sought to remove the judge on that basis, claiming that he had received information gathered by Special Masters outside the adversarial process. *In re Brooks*, 383 F.3d at 1041. Accepting the judge's statement that "he did not receive *ex parte* communications substantively related to [pending contempt] proceedings," we denied the government's request. *Id.* at 1038.

Today, the government advances a different argument. Alleging no improper outside communications, the government instead claims the July 12 opinion's language, together with this court's repeated reversals of the district court's decisions, warrants reassignment. "No reasonable observer," the government argues, "would believe that a court that has viciously and baselessly denounced a cabinet department and its leadership as villainous racists could properly oversee its activities and adjudicate further claims." Appellants' Br. 53.

To prevail, the government has a heavy burden. As the Supreme Court observed in *Liteky v. United States*, although "[t]he judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person," still "the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task." *Liteky*, 510 U.S. at 550-51. Removal for bias is appropriate "even though [the judge's opinion] springs from the facts adduced or the events occurring at trial" only when "it is so extreme as to display clear inability to render fair judgment." *Id.* at 551.

Applying *Liteky* is a delicate task. First and foremost, we must take special care to avoid undermining the ability of district judges to perform their responsibilities. Particularly in hard-fought litigation dealing with controversial issues, district judges must sometimes take strong actions and use strong words. Presiding over such challenging cases would become even more difficult if district judges had to worry that appellate courts would routinely review their decisions not just for legal error, but for bias as well. *See United States v. Roach*, 108 F.3d 1477, 1484 (D.C. Cir. 1997) ("In a controversial, sharply contested case presided over by an experienced district judge, strongly stated judicial views rooted in the record should not be confused with judicial bias."), *vacated in part on other grounds*, 136 F.3d 794 (D.C. Cir. 1998). For this reason, and because except in the most unusual circumstances we trust judges to put their personal feelings aside, recusal must be limited to truly extraordinary cases where, as *Liteky* puts it, the judge's views have become "so extreme as to display clear inability to render fair judgment," *Liteky*, 510 U.S. at 551.

28

In the rare case that meets the *Liteky* standard, however, removal is essential to "preserve[] both the appearance and reality of fairness, 'generating the feeling, so important to a popular government, that justice has been done.'" *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 172 (1951) (Frankfurter, J., concurring)). The appearance of partiality cuts at the heart of the judicial system. *See Bridges v. California*, 314 U.S. 252, 282 (1941) (Frankfurter, J., dissenting) ("The administration of justice by an impartial judiciary has been basic to our conception of freedom ever since Magna Carta."). Just as reassignment is necessary if reasonable observers could believe that improper outside contacts influenced a judicial decision, *see Microsoft I*, 56 F.3d at 1463, so too is reassignment necessary if reasonable observers could believe that a judicial decision flowed from the judge's animus toward a party rather than from the judge's application of law to fact.

With these principles in mind, we turn to the case before us, beginning with the language of the July 12 opinion. The government believes that "the court's moral condemnation has caused it to depart from judicial norms" and that the court has an "unshakeable view that Interior is guilty of global malfeasance, and that the court's duty is to ferret out the evidence of its misdeeds." Appellants' Br. 55. Plaintiff-beneficiaries have a very different view of the July 12 opinion. They insist that "[w]hile forcefully worded, the district court's rulings are founded entirely on the evidence of record set forth in more than nine years of litigation and over 200 days of evidentiary hearings." Appellees' Br. 31.

Although the July 12 opinion contains harsh—even incendiary—language, much of that language represents nothing more than the views of an experienced judge who, having presided over this exceptionally contentious case for almost a

decade, has become "exceedingly ill disposed towards [a] defendant" that has flagrantly and repeatedly breached its fiduciary obligations. *Liteky*, 510 U.S. at 550. We ourselves have referred to Interior's "malfeasance," "recalcitrance," "unconscionable delay," "intransigen[ce]," and "hopelessly inept management." *Cobell VI*, 240 F.3d at 1096, 1109; *Cobell XII*, 391 F.3d at 257; *Cobell XIII*, 392 F.3d at 463.

Yet portions of the July 12 opinion go further. Most seriously, although no one, not even the government, doubts that racism ran rampant at Interior a century ago, *see* Appellants' Reply Br. 19 (acknowledging that "a government expert witness . . . agreed . . . that Commissioner of Indian Affairs Sells, who held office in the early part of the last century, believed that white people were superior to Indians"), the July 12 opinion extends beyond historical racism and all but accuses *current* Interior officials of racism. "[O]ur 'modern' Interior department," the opinion declares, is "a dinosaur—the morally and culturally oblivious hand-me-down of a disgracefully racist and imperialist government that should have been buried a century ago, the last pathetic outpost of the indifference and anglocentrism we thought we had left behind." *Cobell XV*, 229 F.R.D. at 7. Other statements reinforce the district court's apparent belief that racism at Interior is not just a thing of the past: "our government still treats Native American Indians as if they were somehow less than deserving of the respect that should be afforded to everyone in a society where all people are supposed to be equal." *Id.* The opinion also dismisses the possibility that "the stories of murder, dispossession, forced marches, assimilationist policy programs, and other incidents of cultural genocide against the Indians are merely the echoes of a horrible, bigoted government-past that has been sanitized by the good deeds of more recent history." *Id.*

To be sure, Interior's deplorable record deserves condemnation in the strongest terms. Words like "ignominious" and "incompeten[t]" (the district court's) and "malfeasance" and "recalcitrance" (ours) are fair and well-supported by the record. Even drawing inferences of racism might well have been appropriate were Interior's motives relevant, as they would be in a discrimination case, for such inferences would be "necessary to completion of the judge's task," *Liteky*, 510 U.S. at 551. Here, however, Interior's motive had nothing to do with the issue pending in the district court—whether inaccuracies in trust information require notice to Indian beneficiaries. Indeed, the district court made clear that it viewed the facts relevant to that inquiry as uncontested. *See Cobell XV*, 229 F.R.D. at 16 ("Interior does not dispute the factual predicates of the plaintiffs' argument.").

Other passages in the July 12 opinion are also troubling. The opinion describes Interior as an agency whose "spite" has led it to turn its "wrath" on trust beneficiaries and engage in "willful misconduct," "iniquities," "scandals," "dirty tricks," and "outright villainy." *Id.* at 10, 11, 22. Words like these, especially given the limited issue the July 12 order resolves, suggest the district court has condemned not just Interior's particular failures as trustee, but the Department as an institution.

We have little doubt that this parade of serious charges, all unconnected to the issue before the district court, could contribute to a reasonable observer's belief that Interior stands no chance of prevailing whatever the merits of its position. But we need not decide whether such charges, standing alone, require reassignment, for the charges do not stand alone. Rather, they follow an unbroken string of reversed district court orders, all directed against Interior. As we have held, "[a]lthough a legal ruling may not itself serve as the basis for a

motion to disqualify, a particular judicial ruling can be *evidence* of . . . bias or prejudice." *United States v. Barry*, 938 F.2d 1327, 1340 (D.C. Cir. 1991) (citations and internal quotation marks omitted).

Here, there is not just one "particular judicial ruling," but eight. In two, the district court imposed an inappropriate evidentiary burden on Interior (*Cobell XII* and *XIII*). In three, it underestimated the harmful effects its orders would have on the government (*Cobell XVII* and the two cases decided today). And in three others, it both assumed the mantle of a prosecutor and authorized biased investigations (*Cobell VIII*, *In re Brooks*, and *In re Kempthorne*). In four cases, we found abuses of discretion (*Cobell XII*, *XIII*, *XVII*, and No. 05-5388), in three (the mandamus actions) we found Interior had a clear and indisputable right to relief (*Cobell VIII*, *In re Brooks*, and *In re Kempthorne*), and in one we found the district court had used a procedural rule to accomplish a substantive goal (this case). We set aside contempt citations against the Secretary and other senior Interior officials (*Cobell VIII*), and twice found that the district court awarded injunctive relief without the required evidentiary hearing (*Cobell XII* and *XVII*). Ten judges of this court have heard one or more of these appeals. Not one has dissented.

Plaintiff-beneficiaries insist the record is not as one-sided as the foregoing summary suggests. In a footnote, they assert that "[n]otably, the district court has ruled against plaintiffs or limited their relief sought." Appellees' Br. 41 n.39. "Notably," however, they provide no citation to any such action. Asked at oral argument for examples of significant relief the district court had denied plaintiff-beneficiaries, counsel first cited the court's rejection of their request for a trial date on the adequacy of Interior's accounting for the named plaintiffs. But the district court denied that motion without prejudice because it

"conclude[d] that the pendency of appellate review of the issues surrounding the defendants' accounting duties at issue in this litigation render[ed] it inappropriate to set a date for trial on those issues at [that] time," *Cobell v. Norton*, No. 96-1285 (D.D.C. June 3, 2005)—hardly a crushing blow.  Counsel also cited the district court's 1998 denial of plaintiff-beneficiaries' request for interim relief.   Given plaintiff-beneficiaries' sweeping victory in the subsequent bench trial, however, we hesitate to ascribe much significance to that decision.  Finally, counsel observed that the district court has repeatedly refused to place the trust assets into receivership.  But as the July 12 opinion makes clear, those refusals stem not from any sympathy for Interior, but rather from the district court's concern that placing assets in receivership "would constitute an announcement that negligence and incompetence in government are beyond judicial remedy." *Cobell XV*, 229 F.R.D. at 22.

Plaintiff-beneficiaries' challenge to the uniformity of this court's reversals fares no better.  Their only example of a break in the constant stream of reversals is our dismissal with prejudice of a government appeal.  They neglect to mention, however, that the order they cite did not affirm on the merits, but instead responded to the government's motion for voluntary dismissal.  *See Cobell v. Norton*, No. 03-5063, 2003 WL 22136383 (D.C. Cir. Sept. 9, 2003).

In short, in case after case the district court granted extensive relief against Interior, and in case after case we reversed, even under highly deferential standards of review.  To be sure, repeated reversals, without more, are unlikely to justify reassignment.  But here there is more.  For one thing, on several occasions the district court or its appointees exceeded the role of impartial arbiter by issuing orders without hearings and by actively participating in evidence-gathering.  For another, the July 12 opinion levels serious charges against Interior and its

officials, charges that not only bear no relationship to the issue pending before the court, but also go beyond criticizing Interior for its serious failures as trustee and condemn the Department as an institution.

From all of this evidence, "an objective observer is left with the overall impression," *Microsoft I*, 56 F.3d at 1463, that the district court's professed hostility to Interior has become "so extreme as to display clear inability to render fair judgment," *Liteky*, 510 U.S. at 551. What distinguishes this case from one in which a judge has merely become "exceedingly ill disposed towards [a party which] has been shown to be . . . thoroughly reprehensible," *id.* at 550-51, is, most certainly, not any redeeming aspect of Interior's behavior as trustee. Rather, what distinguishes this case is the combination of the content of the July 12 opinion and the nature of the district court's actions. Given these seemingly unique circumstances, and given that "justice must satisfy the appearance of justice," *Offutt v. United States*, 348 U.S. 11, 14 (1954)—that is, reasonable observers must have confidence that judicial decisions flow from the impartial application of law to fact, not from a judge's animosity toward a party—we conclude, reluctantly, that this is one of those rare cases in which reassignment is necessary.

## VI.

We close with a warning to the parties. In *Cobell VI*, we recognized that "the federal government has failed time and again to discharge its fiduciary duties," resulting in a serious injustice that has persisted for over a century and that cries out for redress. *Cobell VI*, 240 F.3d at 1086. Yet today, five years later, no remedy is in sight, this case continues to consume vast amounts of judicial resources, and growing hostility between the parties distracts from the serious issues in the case.

Our ruling today presents an opportunity for a fresh start. As the litigation proceeds, the government must remember that although it regularly prevails on appeal, our many decisions in no way change the fact that it remains in breach of its trust responsibilities. In its capacity as trustee and as representative of all Americans, the government has an obligation to rise above its deplorable record and help fashion an effective remedy. For their part, counsel for plaintiff-beneficiaries, as counsel to a large class of Indians and as officers of the court, would more ably advance their worthy cause by focusing their energies on legal issues rather than on attacking the government and its lawyers.

The July 12 order is vacated and the matter remanded to the chief judge of the district court with instructions to reassign the case. We expect both parties to work with the new judge to resolve this case expeditiously and fairly.

*So ordered.*